1

2

3

4

5

6

7

8             IN THE UNITED STATES DISTRICT COURT

9           FOR THE EASTERN DISTRICT OF CALIFORNIA

10   ROBERT BASQUE,

11             Petitioner,              No. CIV S-07-0258 GEB KJM HC

12        vs.

13   TERESA SCHWARTZ, Warden, et al,

14             Respondent.             FINDINGS AND RECOMMENDATIONS

15   _____/

16          Petitioner is a parolee proceeding with counsel on a petition for a writ of habeas

17   corpus under 28 U.S.C. § 2254.   He alleges that his rights under the Americans With Disabilities

18   Act (ADA) and the Fourteenth Amendment's equal protection and due process clauses were

19   violated by his exclusion from placement at a fire camp during his term of incarceration in the

20   California Department of Corrections and Rehabilitation (CDCR), because he is HIV positive.

21   I.  Procedural Background

22          Petitioner originally brought his concerns to this court in a civil rights action

23   under 42 U.S.C. § 1983, seeking an injunction directing the defendant prison officials to transfer

24   him to a conservation camp or grant him the same increased credit earning status as an

25   inmate actually placed in a camp, among other things.  See Basque v. Schwarzenegger, Civ. No.

26   S-05-1612 FCD KJM P.  In that case, the court granted defendants' motion to dismiss, reasoning

1

that if it were to grant plaintiff's request for additional good time, plaintiff would gain a speedier release from prison, a remedy available only in a habeas action.  See id. (Order Filed December 20, 2005).

Petitioner turned to the state courts and filed habeas petitions in Solano County Superior Court, the Court of Appeal for the First Appellate District, and the Supreme Court, all of which were denied. Pet., Exs. I, M & N.

Petitioner filed his federal petition here on February 9, 2007. He alleges that because of his HIV status, as a matter of policy, he was denied a chance to be assigned to the fire camp, where he could earn additional work-time credits and thus reduce his term of imprisonment. He argues that this work assignment policy violates his rights to due process and equal protection and also violates the ADA.

Respondent filed a motion to dismiss for lack of jurisdiction.  On October 17, 2007, this court issued findings and recommendations recommending that the motion be denied; the district court adopted this recommendation on December 27, 2007.  Docket Nos. 15, 16.   The court directed respondent to file an answer.

Respondent filed a second and supplemental motion to dismiss on April 15, 2008. In support of this motion, respondent argued that petitioner's release on parole renders his habeas petition moot in accordance with established Supreme Court and Ninth Circuit precedents.  On January 20, 2009, this court recommended that the motion be denied; the district court adopted that recommendation on April 24, 2009 and directed respondent to file an answer.  Docket Nos. 27, 28.

After the answer and traverse were filed, petitioner filed a motion for an evidentiary hearing.  This court granted the motion and held an evidentiary hearing on November 23, 2009.  Steven Sanders, Esq., appeared for petitioner; Robert Cross, Deputy Attorney General appeared for respondent.  Docket Nos. 45, 47.

/////

1    Petitioner relied on his own testimony, while respondent called Douglas Peterson,

2  a physician with the CDCR.  In addition, the parties agreed to use respondent's exhibits and

3  stipulated to their authenticity.   These were entered into evidence as a whole without objection.

4  RT 2, 5-6.[1]

5  II.  CDCR Fire Camps

6    Conservation camps or centers are creatures of California Penal Code section

7  6200, which establishes three such centers:  Sierra Conservation Center, the North Coast

8  Conservation Center and the Southern Conservation Center, which is based at the California

9  Institute for Men.  Cal. Penal Code § 6203.  A network of branches or "permanent,  temporary,

10  and mobile camps" extends from each center.  Cal. Penal Code § 6202; see CDCR Department

11  Operations Manual (DOM) § 51130.5 (listing the camps).  The work of the centers includes:

12    public conservation projects, including, but not limited to, forest
     fire prevention and control, forest and watershed management,
13    recreational area development, fish and game management, soil
     conservation, and forest watershed revegetation.
14

15  Cal. Penal Code § 6202.

16    According to 15 Cal. Code Regs. § 3355(c):

17    Inmates shall be personally screened by a medical officer before
     receiving medical clearance for assignment to a camp or fire
18    fighting assignment. Such inmate shall be in generally good health
     and physically capable of strenuous and prolonged heavy labor
19    without danger to the inmate's health and safety or the safety of
     others when involved in hazardous work such as forest firefighting.
20    Exceptions: an inmate may be assigned to light duty non-hazardous
     work in camp if a department physician specifically approves such
21    assignment."

22    In 2002, the California Legislature enacted Penal Code section 2933.3, which

23  permits inmates assigned to fire camps to "earn two days of worktime credit for every one day of

24  service" for work performed after January 1, 2003.  Regulations adopted in the wake of this

25  ─────────────────

26    [1]  All exhibits are referenced herein simply as "Ex. ___."

1  change established a new work group F, for inmates assigned to "full-time conservation camp

2  work," who "shall be awarded two days credit for each day of qualifying performance." 15  Cal.

3  Code Regs. § 3044 (b)(1).  "[A]ll assignments or reassignments of an inmate to a work/training

4  incentive group shall be made by a classification committee in accordance with this section."  Id.;

5  see also DOM §§ 51130.8 (Classification Committee evaluates escape potential when

6  considering camp placement), 62010.3.2 (duties of Associate Warden, member of Classification

7  Committee, include approval of camp placement), 62010.8 (duties of Institution Classification

8  Committees include program participation and transfer) & 62010.8.4 (duties of Unit

9  Classification Committee (UCC) include program and transfer).

10  III.   Evidentiary Record

11       A.  Key Exhibits

12           In a memorandum concerning the implementation of the new Work Group F dated

13  January 24, 2003, W.A. Duncan, CDCR's Deputy Director of the Institutions Division, discussed

14  the criteria for camp placement in wake of changes to California Penal Code § 2933.3.  In the

15  memorandum, Duncan wrote:

16           Effective immediately, during RC [Reception Center] processing
           and during regular GP Classification Committees (initial, annual,
17           program reviews, etc) inmates shall be evaluated for Camp
           placement utilizing this criteria.
18

19  Ex. A at 36-37; see also RT 88.

20  /////

21  /////

22  /////

23  /////

24  /////

25  /////

26  /////

4

In December 2003, Roseanne Campbell, then the Director of CDCR's Health Care Services Division, issued a memo about the medical criteria for camp placement.   It read in part:

> To be medically cleared for Grade/EFF or Camp Skills, inmates must be physically and mentally capable of completing their assigned duties safely and effectively, without being placed at risk by individual medical conditions when they work in remote locations without prompt access to emergency medical or definitive medical care, or when they work under severe and possibly adverse environmental conditions including but not necessarily limited to, exposure to: extreme heat, cold, rain, snow and /or high-pressure water, high altitude (above 5,000 feet), potentially toxic inhaled particulate and gasses, or wildfires.

Ex. C (12/3 memo at 3).

In addition to this somewhat general standard, the CDCR promulgated camp criteria to be listed on posters to be placed in medical clinics conducting camp screenings. Among the conditions listed were "no reportable or acutely contagious infectious disease" and "R/C BP: No higher than 150/95." Ex. C (poster criteria); RT 16-17.   Petitioner relied on the criteria listed on the posters in examining witnesses at the evidentiary hearing.  See RT 14-15, 98.  The court relies on the undisputed complete criteria in its ultimate factual findings.  These provide in part:

> NO hypertension currently requiring treatment with more than two (2) permitted antihypertensive medications, or with a loop diuretic: . . .
>
> Resting seated blood pressure no higher than:
>
> > Systolic: no greater than 140 mm Hg
> > Diastolic: no greater than 90 mm Hg
>
> Patients on loop diuretics may be cleared for Camp if their blood pressure has normalized and remained stable over the last 6 months, but must have a CDC 128-C medical chrono restricting them to Camp and denying them permission to go to a Fire Line.

Ex. C (criteria at 9).  The complete criteria concerning infectious disease provided:

> NO reportable or currently contagious infectious disease requiring assessment by nursing staff (RN or MTA) more often than every sixty (60) days.

NO contagious or reportable infectious disease requiring assessment by a physician or ancillary provider more often than every four (4) months.

NO contagious or reportable infectious disease requiring specialist assessment or follow up more often than every twelve (12) months.

<u>Id</u>. In addition, the criteria concerning medication provide:

ELIGIBLE IF:

NO more than two (2) prescription drugs for any one condition; NO more than four (4) prescription drugs at any one time because there is an increased risk of unpredictable drug interactions with more than four (4) prescription drugs.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

NO anticonvulsant other than Neurontin (gabapentin) and that ONLY if prescribed for control of chronic pain.

<u>Id</u>. (criteria at 12-13). In addition, the criteria for musculoskeletal impairment provide:

ELIGIBLE IF:

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

NO condition limiting the ability to walk moderate distances at altitudes above 5,000 ft. and/or over rough or uneven terrain, without or without medication, treatment or reasonable accommodation.

NO condition limiting the ability to perform Camp SPECIAL SKILLS assignments, with or without medication, treatment or reasonable accommodation.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

/////

/////

/////

/////

/////

> Medically indicated protheses, orthoses, assistive devices and/or adaptive equipment (with all related harnesses and accessories) must be appropriately fitted, functional, and in good condition or repair, on a Fire Line and must not create safety issues. Inmates possessing equipment felt to create or to pose a risk of creating such issues must be issued a CDC 128-C chrono restricting them to Camp and prohibiting them from going to a Fire Lane.

Id. (criteria at 14-15). Finally, the criteria concerning HIV provide:

> ELIGIBLE:

> In accordance with departmental housing policy.

Id. (criteria at 11).

The parties presented two housing policies for HIV positive inmates. The first, contained in Administrative Bulletin 91/29, issued September 20, 1991, provides that HIV positive inmates in "group 2 and 3 do not usually require other than routine medical care" could be housed at institutions where hospital care is available for progressive medical care . . . the California Medical Facility (CMF) . . . and California Institution for Men (CIM). Ex. B at 2. This document references an attachment described as outlining exceptions to this policy, but the attachment has not been provided. Id. CIM is the satellite institution for a number of camps. Cal. Penal Code § 6203. Nothing in the policy directly addresses whether CIM placement might extend to any of its satellite camps and the parties have not otherwise addressed this question. The parties have presented no evidence showing that the 1991 policy was in fact in effect when petitioner was in prison.

The second, 2008 policy provides that HIV Category I inmates shall be eligible for camp placement. Ex. D at 2.

B. Testimony

Petitioner was diagnosed with HIV in 1985 and at first just hoped to stay healthy. RT 4.[2] In 1996, he began to take protease inhibitors, which allowed him to live a more normal

---

[2] RT refers to the Reporter's Transcript of the evidentiary hearing, held November 23, 2009.

1  life.  Id.  His HIV positive status does not cause problems in his daily life.  RT 49.  In addition,

2  petitioner has suffered from hypertension since he was twenty-one, but has controlled it with

3  medication.  RT 7.

4        On April 23, 2003, petitioner was driving while intoxicated and caused an

5  accident, which killed two people.  RT 4, 37.  He injured his ankle in the accident and, as a

6  result, had four different surgeries, including one to lengthen his Achilles tendon in order to

7  speed healing; his Achilles tendon did not rupture.  RT 38, 97.  The pins initially put in his ankle

8  could be removed, but petitioner did not want to undergo further surgery.  RT 38, 98.

9        In March 2004, he was sentenced to a term of six years in prison following his

10  conviction on two counts of vehicular manslaughter.  RT 4; Ex. A at 43.  Before he went to

11  prison, petitioner learned that inmates assigned to fire camp received two days credit for each day

12  served.  RT 26.  Because he wanted to shorten his sentence, he wanted to be assigned to camp

13  and felt he was able to handle a light duty assignment.  RT 21.

14        When petitioner arrived at the North Kern State Prison reception center on March

15  30, 2004, he disclosed his HIV status to prison authorities.  RT 5.  The "Standardized Bus

16  Screening Form" describes petitioner as under a doctor's care for HIV and hypertension.  Ex A at

17  183; RT 6.[3]  His blood pressure was recorded as 136/88 and remained in that general range

18  during his stay at the reception center.  Ex. A at 184, 251.

19        The reception center medical clearance/restriction chrono dated April 2, 2004,

20  notes that petitioner was cleared for full duty, was not camp or CCF eligible, is in Chronic

21  Infectious Disease Group II, and needs medication for his hypertension.  Ex. A at 21; RT 19.

22  Petitioner informed those conducting the evaluation that he had had an ankle injury, but the box

23  for "mobility impaired" was not checked.  RT 20; Ex. A at 21.  The record of the reception center

24

25     [3]  The form includes "bipolar" as one of petitioner's medical diagnoses.  Ex. A at 183.
Petitioner explained that after the accident, he saw psychiatrists and psychologists, who
mentioned bipolar disorder as a possibility.  He was never put on medication and was never

26  officially diagnosed as bipolar.  RT 7.

medical exam, dated the same day, also notes petitioner's hypertension and HIV diagnoses, but cleared him for full duty. Ex. A at 182.  According to Dr. Peterson, this medical examination was the initial determination of petitioner's fire camp eligibility.  RT 88.

Upon his arrival at CMF on June 2, 2004, petitioner had a classification score of thirteen, a privilege and work group of A1A, but a medical override that caused him to be housed at a higher security facility.  Ex. A at 15.  Around the time of his arrival, petitioner asked to be assigned to fire camp, but was told he would not be considered because he has HIV.  RT 21-22.

Petitioner attended his initial review at CMF on June 10, 2004.  RT 22.  The committee recorded that petitioner was medically cleared for full duty, "noting CID Group II per CDC 128C-1 dated 4-2-04." Ex. A at 16.  The committee also found that petitioner "remains ineligible for CCF, MCCF, CAMP, and SAP due to CID status," but "eligible for MSF [Minimum Support Facility] placement." Ex. A at 16; RT 23.  Finally, the committee "acts to accept at CMF-II Unit IV as a CID Group II case, custody established as MED A. . . ." Ex. A at 16.  Dr. Peterson testified that the classification committee considers many factors, including information received from the medical department about infectious disease, in determining an inmate's appropriate placement.  RT 85.  However, neither party called any witness who could shed more light on the classification process or who had participated in any of the committees petitioner attended.

After petitioner had been at CMF about thirty days, he was called into the captain's office and told that because of separate litigation, in which petitioner was not involved as a party, the prison was going to be assigning HIV positive inmates to kitchen jobs.  RT 57.  Petitioner demurred, not wanting to be the "poster child" for HIV food workers, but the captain assured him things would be all right.  Id.  Within a week, petitioner was assigned to the kitchen.  Inmates knew he was HIV positive based on his housing assignment and were not happy that he was cooking their food.  RT 59.  One inmate in particular was very vocal about his displeasure with petitioner's assignment and petitioner felt threatened.  Id.

9

1   Instead of "snitching," petitioner used his ankle injury to get out of the kitchen,

2   although he acknowledged that he had actually fallen twice on slippery floors.  RT 38-39, 40, 60.

3   The court credits the totality of petitioner's testimony in this regard.  See Gates v. Rowland, 39

4   F.3d 1439, 1447-48 (9th Cir. 1994) (recognizing inmates' antipathy to HIV positive inmates

5   working in food service).

6   Accordingly, he secured a  medical chrono (CDC 128-C), dated August 23, 2004,

7   which said petitioner "could not work around slippery surfaces because [of] a history of complex

8   fracture of the right ankle."  Ex. A at 18.  This chrono was renewed in August, 2005.  Ex. A at

9   244.

10   Around the same time, petitioner filed a request for a reasonable accommodation,

11   noting that "weakness and nerve damage to right ankle" produced a "walking/climbing/mobility

12   disability," and asked for a lower bunk.  Ex. A at 47.  On August 28, 2004, petitioner filed a

13   grievance asking for a lower bunk chrono because "it is very painful, as well as dangerous for me

14   to climb onto a [sic] upper bed."

15   On September 2, 2004, another medical chrono recorded petitioner's "history of

16   "an Achilles surgery on the right," as well as petitioner's claimed difficulty in climbing into an

17   upper bunk, and so prescribed a lower bunk.  Ex. A at 19.  Once again, petitioner testified he

18   exaggerated problems with his ankle to get a lower bunk, although he acknowledged he slipped

19   twice trying to get into the upper bunk because there was no ladder.  RT 41, 64.  He testified that

20   just before he asked for the accommodation, his bunk-mate on the lower bunk informed him in

21   no uncertain terms that he did not want an HIV positive bunk-mate.  RT 63.

22   In late 2004, petitioner  filed a grievance about his exclusion from fire camp.  The

23   Director's Level determination, issued in April 2005, said that the rejection was "based on

24   appellant's unique health care needs as determined by the doctors responsible for his care.  The

25   appellant does not meet the criteria for camp placement and therefore does not meet the criteria

26   for a sentence reduction."  Ex. A at 1.  The second level decision relied on medical chronos and

other health information in petitioner's file to determine he was not eligible for camp.  Ex. A at

7-8.  The first level review also relied on chronos, which the reviewer characterized as showing

that petitioner would not meet the physical qualifications for camp.  Ex. A at 12.  Despite this

reliance on medical records, petitioner was never given a medical examination to determine

whether he was qualified for camp placement.  RT 28.

On January 3, 2005, in response to petitioner's complaints about being held at a

higher security facility and prohibited from camp placement, Dr. Bick, the Chief Medical Officer

of the Outpatient Services at CMF, wrote that there were "no medical contraindications to

[petitioner's] being transferred to CIM, CMC, CMF or CORCORAN at that time."  Ex. A at 39;

RT 23.   These were the institutions identified in the 1991 housing policy for HIV positive

inmates.  Ex. B at 2-3; RT 25.

At a program review on January 27, 2005, the UCC recognized that petitioner had

asked for placement at the fire camp through the grievance process and was offered placement at

the CIM MSF.  Ex. A at 69.  The committee determined that although petitioner was not

categorically excluded from MSF placement, his commitment offense involved the death of two

people and so undertook a "case by case review" to determine his eligibility.  Id.  It concluded

that petitioner's "preclusion from MSF based on this commitment offense would be

inappropriate," but did not order petitioner transferred at his request.  Petitioner told the

committee that he pursued the grievance because he wanted camp placement and eligibility for

two for one credit.  Id.

At a subsequent annual review, held March 30, 2005, the UCC again observed

that petitioner was ineligible for camp placement "due to CID status."  Ex. A at 68.

Petitioner took a number of medications while in prison; his medication records

show he was consistently prescribed Tenofovir, Atenolol, Acyclovir, Combivir and on occasion

Rofexib.  In addition, he received Gabapentin, and 800 milligrams of Ibuprofen as needed.  Ex. A

at 149, 152, 159, 161.  Petitioner took medication for high blood pressure, which remained well

controlled. Ex. A at 134.  Most of the medications came in thirty day supplies, except for

Gabapentin, which was administered individually from the cart.  RT 67.  He took Gabapentin for

pain from nerve damage in his ankle and foot, stemming from the ankle and surgeries.   RT 42,

44, 45; Ex. A at 137-138.  Petitioner's medication records show, however, that he did not take

this medication consistently.  Ex. A at 140-148, 1153-1155.  In 2005, Nurse Camacho asked

petitioner why he was not taking his medication and petitioner said he would take it only when

he needed it.  Ex. A at 240-241; RT 53.

Petitioner followed a regime of medication for his HIV, none of which produced

serious side effects.  RT 48.  At least once, he did not receive his HIV medication in a timely

fashion and so filed a grievance, noting that he might have serious health consequences if he was

consistently deprived of the medication.  Ex. A at 77; RT 45.  Nevertheless, he did not suffer any

ill effects because of the lapse in his medication.  RT 69.  In fact, about nine months before

petitioner's release, his viral load increased, which suggested that one of the medications was

losing its efficacy.  At that point, he discontinued his HIV medication altogether, choosing to

wait until his release to start a new regime.  RT 50.

Douglas Peterson, the CDCR physician, has been a regional medical director for

two of the institutions with satellite fire camps and was the lead physician for the reformulation

of CDCR's medical classification system.   RT 74.  He was involved in discussions of camp

placement criteria in 2007 and 2008.  RT 74.

According to Dr. Peterson, the chief work of the fire camp is not in the camp itself

but at the site of a fire; even those not designated as firefighters are sometimes deployed to "wild

country" to deal with a "changing, stressful, urgent situation."  RT 75.  Physicians are not

assigned to camps, but nurses do visit intermittently.  RT 75-76.

Before the evidentiary hearing, Dr. Peterson had reviewed petitioner's central file

and formed the opinion that petitioner would not have been qualified for camp placement.

RT 76.  First, petitioner was on high intensity anti-retroviral therapy, which can create a risk to

1  health if it is interrupted and which also can produce serious side-effects.  According to Dr.

2  Peterson, petitioner would need periodic monitoring of his immune status.  RT 76.  Second,

3  petitioner had had a complex repair to his ankle and an Achilles rupture, which might

4  compromise petitioner's ability to move quickly away from a fire.  RT 77.  Dr. Peterson did not

5  believe that any competent physician would have assigned petitioner to a fire camp.  RT 78.  The

6  doctor also was not aware of any HIV positive inmate who had been placed at a fire camp.  RT

7  79.  "[T]he general feeling is . . . for people who have anti-viral therapy that camp is an

8  inappropriate and highly risky placement for those people."  RT 91.  If petitioner was in the

9  chaotic environment of a fire camp, his medication delivery might be interrupted, which would

10  be risky for him.  RT 92.  In addition, there would be no one available to administer his pain

11  medication.  Id.

12         Neither party presented any testimony or exhibits identifying and describing in

13  any meaningful detail the light-duty positions at fire camps.  Dr. Peterson believed that even

14  cooks and clerks deployed to fire areas, but this belief is contradicted by several portions of the

15  medical criteria, which recognized that some inmates can be assigned to a camp, but precluded

16  from fire line.  RT 93; cf. Ex. C at 14-15.

17  IV.  Standards Under The AEDPA

18         An application for a writ of habeas corpus by a person in custody under a

19  judgment of a state court can be granted only for violations of the Constitution or laws of the

20  United States.  28 U.S.C. § 2254(a).  Also, federal habeas corpus relief is not available for any

21  /////

22  /////

23  /////

24  /////

25  /////

26  /////

claim decided on the merits in state court proceedings unless the state court's adjudication of the

claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (referenced herein in as "§ 2254(d)" or "AEDPA").[4]  It is the habeas

petitioner's burden to show he is not precluded from obtaining relief by § 2254(d).  See

Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1)  are

different.  As the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts.  The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case.  The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams [v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002).  A state court does not apply a rule different from the

law set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply

fails to cite or fails to indicate an awareness of federal law.  Early v. Packer, 537 U.S. 3, 8

(2002).

The court will look to the last reasoned state court decision in determining

whether the law applied to a particular claim by the state courts was contrary to the law set forth

---

[4]  Title 28 U.S.C. § 2254(d) establishes a precondition to federal habeas relief, not grounds for entitlement to habeas relief.  Fry v. Pliler, 551 U.S. 112, 118-19 (2007).

in the cases of the United States Supreme Court or whether an unreasonable application of such law has occurred.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002), cert. dismissed, 538 U.S. 919 (2003).  Where the state court fails to give any reasoning whatsoever in support of the denial of a claim arising under Constitutional or federal law, the Ninth Circuit has held that this court must perform an independent review of the record to ascertain whether the state court decision was objectively unreasonable.  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  In other words, the court assumes the state court applied the correct law, and analyzes whether the decision of the state court was based on an objectively unreasonable application of that law.

It is appropriate to look to lower federal court decisions to determine what law has been "clearly established" by the Supreme Court and the reasonableness of a particular application of that law.  "Clearly established" federal law is that determined by the Supreme Court. Arredondo v. Ortiz, 365 F.3d 778, 782-83 (9th Cir. 2004).  At the same time, it is appropriate to look to lower federal court decisions as persuasive authority in determining what law has been "clearly established" and the reasonableness of a particular application of that law. Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 1999); Clark v. Murphy, 331 F.3d 1062 (9th Cir. 2003), overruled on other grounds, Lockyer v. Andrade, 538 U.S. 63 (2003); cf. Arredondo, 365 F.3d at 782-83 (noting that reliance on Ninth Circuit or other authority outside bounds of Supreme Court precedent is misplaced).

/////
//////
/////
/////
/////
/////
/////

15

1    In <u>Taylor v. Maddox</u>, the Ninth Circuit examined the application of the

2 "unreasonable determination" standard in the context of factual findings. It concluded that in

3 several situations, a state court's factual determinations would not be entitled to deference. The

4 court observed:

5        Closely related to cases where the state courts make factual
         findings infected by substantive legal error are those where the
6        fact-finding process itself is defective. If, for example, a state court
         makes evidentiary findings without holding a hearing and giving
7        petitioner an opportunity to present evidence, such findings clearly
         result in an "unreasonable determination" of the facts.
8

9 366 F.3d 992, 1001 (9th Cir. 2004); <u>see also</u> <u>Killian v. Poole</u>, 282 F.3d 1204, 1208 (9th Cir.

10 2002) ("[h]aving refused Killian an evidentiary hearing . . . , the state cannot argue now that the

11 normal AEDPA deference is owed the factual determinations of the California courts"); <u>Green v.</u>

12 <u>White</u>, 232 F.3d 671, 676 (9th Cir. 2000) (no deference to state court factual determination based

13 on speculation rather than on testimony).

14 V.  <u>State Court Decision</u>

15    The last reasoned decision from the state courts in this case was the decision on

16 the petition filed in Solano County Superior Court:

17        In a Petition for a Writ of Habeas Corpus filed with this Court on
         March 14, 2006, Petitioner, Robert Basque, alleges that the
18        Department of Corrections has improperly refused to place him in
         a camp or fire fighting assignment based solely on his disability of
19        being infected with HIV.  Petitioner alleges Due Process and Equal
         Protection violations, as well as violations of the Americans with
20        Disabilities Act and California Civil Code section 54(c).

21        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

22        Petitioner has not adequately shown that he is similarly situated to
         inmates with other disabilities who have received medical
23        clearance for light duty non-hazardous work in camp with respect
         to qualifying for camp placement.  (*People v. Hofsheier* (2006) 37
24        Cal. 4th 1185, 1198; *In re J.* (1979) 25 Cal.3d 522, 530.)  The
         purpose of section 3355(c) of Title 15 of the California Code of
25        Regulations is to make sure that all inmates who might be assigned
         to light duty non-hazardous work, receive medical clearance
26        establishing that they are capable of doing the work and healthy

enough not to pose a danger to themselves or others. Petitioner's medical chronos indicate that he could not be cleared for camp placement not just because of Petitioner's HIV infection, a chronic infectious disease, but also due to his heart disease, his history of ankle fracture and his Achilles surgery. Petitioner fails to establish that his medical problems do not make him any less capable of performing the work or subject him to a heightened need for medical supervision than those inmates who are medically cleared for light duty non-hazardous work.

Even if the Court determined that Petitioner is being treated unequally from other similarly situated inmates, the decision to deny camp placement is rationally related to the Department's legitimate interest in maintaining Petitioner's health and safety while under its custody. (*City of Cleburne v. Cleburne Living Ctr*. (1985) 473 U.S. 432, 439.) As indicated by Department Officials, Petitioner's infection with HIV and his heart disease constitute medical concerns that require continuing monitoring and intervention by medical staff that is not available in a camp situation.

Petitioner has not demonstrated a heightened need for judicial scrutiny. Classifications based on disabilities are not suspect and do not require a more exacting standard of judicial review than is normally accorded economic and social legislation. (*Cleburne, supra,* 473 U.S. at 442; *see Doe v. Wigginton* (6th Cir. 1994) 21 F.3d 733, 739; *Doe v. Univ. Of Md. Medical Sys. Corp*. (4th Cir. 1995) 50 F.3d 1261, 1267.) Moreover, allowing inmates to reduce their total term of commitment by application of work time credit is a privilege, not a fundamental or constitutionally protected right. (Pen. Code § 2933(b); *Wolff v. McDonnell* (1974) 418 U.S. 539, 557. . . .)

Petitioner also claims an arbitrary deprivation of a constitutional right in violation of the Due Process Clause. Given that a lawful conviction permits a State to commit a prisoner in any of its prisons, regardless of whether one institution imposes a more onerous term of confinement than another, it is doubtful that Petitioner has been denied a constitutional right. (*Meachum v. Fano* (1976) 427 U.S. 215, 224.) Regardless, assuming that failure to assign Petitioner to a camp assignment somehow violated a constitutional right retained upon conviction, judicial review is again limited to determining whether the Department's action is rationally related to a legitimate state interest. (*Turner v. Safley* (1978) 483 U.S. 78, 89-90.)

Petitioner also fails to state a prima facie case under the Americans with Disabilities Act. Under the ADA, Petitioner must allege that he is otherwise qualified for the benefit he seeks and that his exclusion, denial of benefits, or discrimination was by reason of the disability. (42 U.S.C. § 12132, *Thompson v. Davis* (9th Cir.

2002) 295 F.3d 890, 895; *Weinreich v. Los Angeles County Metro Transp. Auth.* (9th Cir. 1997) 114 F.3d 976, 978.)   A person is otherwise qualified if he meets the essential eligibility requirements for participation in spite of his handicap.  (42 U.S.C. § 1213(2) [sic]; *School Bd. of Nassau County v. Arline* (1987) 480 U.S. 273, 288.)  Though the Court must consider whether a reasonable accommodation would enable a handicapped person to perform those functions, accommodation is not reasonable if it requires a fundamental alteration of the nature of the program.  (*Arline*, 480 U.S. at 288).

Petitioner fails to provide specific facts and documentary evidence establishing that, but for his HIV infection, he is qualified for placement in camp.  (*Duvall, supra*, 9 Cal. 4th at 475.)  The fact that he was cleared for full duty at an institution with the qualified medical personnel to monitor his HIV infection and heart condition does not necessarily mean that he was qualified for camp.  Petitioner makes no showing that he meets the Department's criteria for camp placement, even for light duty work, or that the Department could have reasonably provided accommodation that would not change the fundamental nature of the program.  Moreover, although Petitioner states that his HIV infection was the only basis for his denial his medical chronos indicate he had additional health problems that contributed to the Department's decision.  His ankle fracture and Achilles surgery rendered him unable to work around slippery surfaces and made climbing difficult.  His heart disease requires medication and monitoring.  These problems likely contributed to the decision to deny camp placement.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Pet., Ex. 4.

VI.  Underground Regulation and California's Administrative Procedures Act

Petitioner argues in part that his exclusion from consideration for fire camp was based on an "underground regulation," adopted in derogation of California's Administrative Procedures Act.  Pet., Points and Authorities (Mem. P. & A.) at 14-16.  However, federal habeas corpus does not lie to address errors of state law and procedure.  Estelle v. McGuire, 502 U.S. 62, 67 (1991) ("We have stated many times that federal habeas corpus relief does not lie for errors of state law." (internal quotation marks and citation omitted)).

/////

VII. <u>Due Process</u>

The Due Process Clause of the Fourteenth Amendment protects persons against deprivations of life, liberty or property.  <u>Wilkinson v. Austin</u>, 545 U.S. 209, 221 (2005).  Those who seek to invoke the procedural protections of the Due Process Clause must establish that one of these interests is at stake.  <u>Id</u>.  "A liberty interest may arise from the Constitution itself . . . , or it may arise from an expectation or interest created by state laws or policies."  <u>Id</u>.

There is no constitutional right to a particular classification or custody status, to be housed in a particular prison, or to have a job.  <u>Olim v. Wakinekona</u>, 461 U.S. 238, 244-45 (1983) (no constitutional right to be housed in any particular prison); <u>Moody v. Daggett</u>, 429 U.S. 78, 88 n.9 (1976) (classification and programs); <u>Vignolo v. Miller</u>, 120 F.3d 1075, 1077 (9th Cir. 1997) (no right to prison job).  Petitioner has not identified those state policies or laws that might give right to a liberty interest in camp placement.  <u>See</u> Mem. P. & A. at 25-28.  Instead, he appears to assume there is a liberty interest and argues that his exclusion from camp without procedural protections thus is arbitrary.  This unsupported argument is insufficient to support his request for relief.

This court cannot find that the superior court applied federal law unreasonably in rejecting petitioner's due process claim.

VIII. <u>Equal Protection</u>

Petitioner also argues the refusal to assign him to camp or otherwise to give him the same credits as those assigned to camp violated his right to equal protection.  He argues that the exclusion must be evaluated under the strict scrutiny test.

The essence of the Equal Protection Clause is that "the State must govern impartially."  <u>Jones v. Helms</u>, 452 U.S. 412, 423 (1981).  Accordingly, the clause "provides a basis for challenging legislative classifications that treat one group of persons as inferior or superior to others, and for contending that general rules are being applied in an arbitrary or discriminatory way."  <u>Id</u>. at 423-24.  The equal protection guarantee "is essentially a direction

1  that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living

2  Center, 473 U.S. 432, 439 (1985).  However, "the Constitution does not require things which are

3  different in fact or opinion to be treated in law as though they were the same."  Plyler v. Doe,

4  457 U.S. 202, 216 (1982).

5       If a particular legislative classification is based on an inherently suspect

6  classification or impinges on the exercise of a fundamental right, then the state must show that

7  the classification is precisely tailored to serve a compelling governmental interest.  Id. at 216-17;

8  Lee v. City of Los Angeles, 250 F.3d 668, 686 (9th Cir. 2001).  Disability and HIV status are not

9  protected classifications.  City of Cleburne, 473 U.S. at 444-46; Doe v. City of Chicago, 883

10  F.Supp. 1126, 1140-41 (N.D. Ill. 1994).  "[A] classification neither involving fundamental rights

11  nor proceeding along suspect lines is accorded a strong presumption of validity."  Heller v. Doe,

12  509 U.S. 312, 319 (1993).  As the Supreme Court has explained:

13        equal protection is not a license for courts to judge the wisdom,
          fairness, or logic of legislative choices.  In areas of social and
14        economic policy, a statutory classification that neither proceeds
          along suspect lines or infringes fundamental constitutional rights
15        must be upheld against equal protection challenge if there is any
          reasonably conceivable state of facts that could provide a rational
16        basis for the classification.

17  Federal Communications Commission v. Beach Communications, Inc., 508 U.S. 307, 313

18  (1993).  Moreover, "it is entirely irrelevant for constitutional purposes whether the conceived

19  reason for the challenged distinction actually motivated the legislature."  Id. at 315.

20       In this case, the officials at the reception center and on the classifications

21  committees could rationally have rejected plaintiff from camp placement out of a concern for his

22  health.   In addition, prison officials could rationally exclude a person from earning the additional

23  work credits if that person did not face the danger and rigor of camp placement.  The Superior

24  Court did not apply federal law unreasonably in reaching the same conclusion.

25  /////

26  /////

IX. <u>ADA</u>

Title II of the ADA provides:

... [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.  Respondent does not dispute that conservation camps are programs or activities of the CDCR, which is a public entity within the meaning of the ADA.  <u>Pennsylvania Department of Corrections v. Yeskey</u>, 524 U.S. 206, 210, 211 (1998).

To prove a Title II claim, a plaintiff must show:

(1) the plaintiff is an individual with a disability; (2) the plaintiff is otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities; (3) the plaintiff was either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability.

<u>Thompson v. Davis</u>, 295 F.3d 890, 895 (9th Cir. 2002).

There are two other ways in which a person claiming the protection of the ADA may prove that he is a person with a disability: by offering proof of a history of an impairment that limits him in a major life activity or evidence that he was regarded as having such a limiting impairment.  <u>Thornton v. McClatchy Newspapers, Inc.</u>, 261 F.3d 789, 798 (9th Cir. 2001), <u>opinion</u> <u>clarified by</u> 292 F.3d 1045 (9th Cir. 2002).

Petitioner has offered no evidence that his HIV status limits him in a major life activity; to the contrary, he testified that his condition does not cause him problems in his daily life.  RT 49.  <u>See</u> <u>Bragdon v. Abbott</u>, 524 U.S. 624, 641-42, (1998) (declining to consider whether HIV infection is a *per se* disability under the ADA).  He has presented evidence that he was regarded as having such an impairment.  In fact, the evidence shows that prison officials regarded him as disabled because of his HIV positive status; on that basis the Classification

1  Committees excluded him from camp placement and housed him in a more secure institution

2  than his classification score warranted.  Ex. A at 16, 39, 68, 69.  This is sufficient to satisfy his

3  burden of showing that the institution treated him as disabled.  Harris v. Thigpen, 941 F.2d 1495,

4  1524 (11th Cir. 1991) (institution that segregated HIV positive inmates treated them as disabled

5  within the meaning of the ADA); Dean v. Knowles, 912 F.Supp. 519, 522 (S.D. Fla. 1996) (issue

6  of fact whether jail treated HIV positive inmates as disabled).  Petitioner also has presented

7  evidence that officials at the Reception Center and thereafter on the Classification Committees

8  refused to consider him for camp based on his "CID status."  See Ex. A at 21, 23, 68, 69.

9      The Superior Court found that petitioner would not have otherwise qualified for

10  camp placement because of his hypertension and ankle injury.  This finding is not entitled to

11  deference because the Superior Court did not consider the camp medical criteria quoted at length

12  above: neither petitioner's hypertension nor his ankle injury would necessarily have precluded

13  him from camp placement.  Moreover, the Superior Court relied on this rationale as it was

14  presented at the various levels of the grievance process, whereas those involved in institutional

15  appeals were not the officials entrusted with the decision to place an inmate in camp.  15 Cal.

16  Code Regs. § 3044 (b)(1).

17      This court similarly does not place considerable weight on Dr. Peterson's

18  opinion, for he apparently did not consider that even with petitioner's ankle injury, he could be

19  assigned a position away from the fire line.  The doctor also apparently misunderstood the nature

20  of the repair to petitioner's Achilles tendon.  See Ex. C at 14-15; RT 77.  In addition, he relied on

21  the fact that no one would be available to administer the Gabapentin even though the criteria

22  does not exclude someone taking this drug from camp placement.  Finally, Dr. Peterson appeared

23  to be aware that several classes of inmates, not only those with mobility impairments, but also

24  those with some blood pressure problems, could be assigned to camp but exempted from fire line

25  duty.  Ex. C at 9.

26  /////

1         Nevertheless, petitioner has not borne his burden of showing he was otherwise

2 qualified for camp placement.  To make such a showing, petitioner must show that he met the

3 other medical requirements for camp placement.  <u>Thompson v. Davis</u>, 295 F.3d 890, 896 (9th

4 Cir. 2002).  The exhibits submitted without objection contain petitioner's medication records,

5 which show that during most of his incarceration, he was taking five prescription drugs.  <u>See</u> Ex.

6 A at 140-148, 153-155.  Petitioner did testify that he stopped taking his HIV drugs when he was

7 nine months away from his release date, but this testimony does not establish that he would have

8 been eligible for camp when he had such little time remaining on his term.  RT 50.  In addition,

9 he has presented nothing suggesting that inmates assigned to light duty positions in camp would

10 be exempt from the medication restrictions.  He has not borne his burden of demonstrating his

11 entitlement to relief.

12         IT IS THEREFORE RECOMMENDED that the petition for a writ of habeas

13 corpus be denied.

14         These findings and recommendations are submitted to the United States District

15 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

16 one days after being served with these findings and recommendations, any party may file written

17 objections with the court and serve a copy on all parties.  Such a document should be captioned

18 "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised

19 that failure to file objections within the specified time may waive the right to appeal the District

20 Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

21 DATED:  January 6, 2010.

22

23 _____

24 U.S. MAGISTRATE JUDGE

25

26